The court will proceed to the fourth case, Acheron Medical Supply v. Cook Medical. May it please the court, my name is Ervin Geslowitz and I'm representing Acheron, the appellate. In my opening argument, I will be addressing our appeal of the district court's summary judgment decision for Cook on Acheron's complaint. I reserve, as part of my rebuttal time, addressing Cook's appeal of the decision on the counterclaim. For purposes of our appeal, there are three undisputed set of facts that should determine the outcome of this case and should have determined it in our favor rather than Cook. First, one of the things that Acheron was supposed to do under this contract was to get a federal supply schedule contract. That's a specialized contract that the VA prefers to use. There's no dispute here that under the VA's regulations, a reseller like Acheron cannot get an FSS unless it obtains a signed letter of authorization from the manufacturer whose products it represents agreeing to allow government access to its sales records. The stated purpose of the regulation, and it's right in there, is to verify that the information that the reseller has submitted in support of its FSS application is accurate. So everything that's submitted in the application, Your Honor, is something that is obtained from the manufacturer, in this case, Cook. Obviously, the VA wants to know if the reseller is not just being used to jack up prices from the manufacturer's prices and that the offered pricing, it's an offered price that you're Second, it's undisputed that Acheron did obtain just such a letter of authorization from Cook, not only once but twice. A version was signed on June 10th, 2014, just prior to the execution of the agreement on July 23rd, 2014. Then, shortly afterwards, on July 28th, 2014, the VA officer asked that it be rewritten to specifically grant government access to all needed commercial sales records. And the letter was then duly rewritten to clarify that Cook would provide, quote, and was given to the VA. Cook signed it at that time but kept the original June 10th, 2014, date. So Acheron had obtained the required letter of authorization from Cook before the agreement was signed and then obtained the perfected version after the agreement was signed. Third, Cook did not honor the letter of authorization. When the VA sent Cook a letter asking for pricing information, Cook refused to cooperate. It also is not disputed that Cook's refusal to cooperate with the pricing verification made it impossible for Acheron to obtain an FSS contract. And in fact, the VA sent a no award letter in December 31st, 2014, giving that very reason for rejecting it, failure to provide the pricing verification that the VA requested. Is that what that, whatever it is, the Office of Inspector General audit? Is that what that was called? Yeah. OIG audit? Yeah. And that was, I don't want to nickname it, but it's a lot of rigmarole, a lot of detail, a lot of stuff that Cook didn't want to do. Yes. It's part of the pricing verification process. In this case, it was the OIG handling it. And the information being requested was consistent with the responsibility of the VA to determine fair and reasonable pricing. So that's a normal procedure for the VA, I guess. Normal procedure. And I would add here, Your Honor, that all of this is in the various publications, websites that the VA put out. This is the way it works. And they specifically say that the OIG could always be participating in doing the audit or the contract officer could, in this case because we were resellers and we didn't have, you know, it was intended to be an agreement worth over $500,000 and we didn't have substantial experience in selling commercially, that increased the chances that it would be an OIG. You're a new company with regard to the VA. Cook's been doing business for some period of time. Yes. Cook is an established company, a $2 billion company. Akron was a recently formed company and was going to be the reseller for Cook to the government. So Cook cut him off and kept selling, right? Yes, that's true. That is true. And to add to the mix, Your Honor, after the VA's no award letter, whatever concerns they had about this audit and all the information being requested, Cook principal Ron Walters wrote emails to the VA official, two different VA officials in January and February 2015, again promising to cooperate with the pricing review, and then Cook reneged once again in March 2015. These are the facts, Your Honor, and they're undisputed. The district court thought all of this was irrelevant because the agreement did not contain an express reference to Cook, quote, reasonably responding to requests for information from the VA or otherwise undertaking any action in aid of Akron fulfilling its duty to obtain an FSS contract, end quote. In its view, consideration of the letter of authorization and Walters' later emails to the VA were barred by the integration clause and the no amendment clause. But the letter of authorization was an independent undertaking by Cook to a third party, the VA, that Cook knew Akron was relying on to get the FSS. The letter was not a pre-contract representation to Akron nor an amendment to the agreement. It was outside the agreement. Furthermore, under the UCC duty of good faith and fair dealing and the common law prevention doctrine, the absence of a specific reference in the agreement to Cook aiding Akron in responding to a VA request for information should not have foreclosed implying a duty to cooperate. And turning first to the good faith and fair dealing, it's clear that in analyzing a UCC contract such as this one, one is not supposed to be using this rigid four-corner approach that the lower court used. Under Indiana's UCC, all UCC contracts are imbued with a duty of good faith and fair dealing, the idea being that commercial contracts cannot anticipate every single contingency. And while it is true that good faith and fair dealing can't be used to contradict or substitute for a provision in a UCC contract, it can and should fill in or imply a duty where the term of the contract may be silent. If doing so would be consistent with the contract's purpose and with course of dealing and course of performance. That especially applied here in light of Cook having signed the letter of authorization. That letter promised the VA that it would allow access to all needed records. Cook knew that Akron was relying on that letter so it could carry out its duty of obtaining an FSS. Akron could not have reasonably anticipated that Cook would then renege on it and violate its commitment to the VA. In these circumstances, it's not proper to buy into the notion that Cook had no duty to cooperate with the Pricing Review just because that was not specifically stated in the agreement. Doing that would only encourage the very type of gamesmanship and opportunistic advantage taking that the good faith concept was designed to do away with. And it's worth noting and repeating again that Mr. Walters later did agree yet again to submit to the VA's Pricing Review after the VA had rejected the FSS application in December 31, 2014. He not only told two different VA officials he would do it, he told Akron so Akron resubmitted the FSS application. He told prime vendors who are the ones you deal with in terms of selling to the VA, and he told Cook's own employees, this is all documented. The district court thought that was irrelevant because, again, it didn't change the fact that nothing in the agreement explicitly required Cook to cooperate. What it did do was remove the supposed good faith objections Cook had to not providing the information in the first place, namely that it was too burdensome or that they didn't understand the process or they thought it was going to be something different than it was. Cook admitted to realizing that the VA only wanted to see not all of the pricing information for all of its nine or ten divisions, but just for endoscopy, and there were only 1,361 products. How many? 1,361 endoscopy products. It was only related to endoscopy. This VA application was only related to that one division of Cook where we, Akron, were the exclusive distributor. There was an idea that then you would go to another division and then another division, but at this point that was all they wanted to see. So when Cook reneged again in March 2015, it lost any pretense of acting in good faith. But you don't have to go down the road of getting hung up on whether the duty to cooperate had to be stated in the agreement or not. There is the prevention doctrine. Under the prevention doctrine, that isn't necessary. The common law prevention doctrine is a very simple equity construct. When one party to an agreement prevents the other party from performing its part, then the other party's performance will be excused. The Indiana Supreme Court, in the case of Jordan v. Indianapolis Water Company, which we cited in the brief, stated it well. Quote, if the act to be done by the party binding himself can only be done or allowed by the other party, an obligation by the latter to do or allow to be done the act or things necessary for the completion of the contract will be necessarily implied. End quote. This case is a tailor-made situation for applying the prevention doctrine. It was impossible for Akron to obtain an FSS without Cooke's cooperation in providing its pricing information for its endoscopy products to the VA. In other words, it was entirely in Cooke's power to prevent Akron from being able to obtain an FSS. What's more, Cooke actually undertook that very obligation when it signed the letter of authorization. It was for this very reason that the information was not provided that the VA issued its no award letter to Akron. Now in its motion for summary judgment, Cooke argues, and I'll quote, the fact that Cooke may have hindered Akron's ability to obtain the FSS contract as a practical matter is of no legal consequence where Cooke did not have a contractual duty to undergo the audit under the agreement. End quote. The district court essentially agreed with that, but the prevention doctrine does not depend on whether or not the duty is stated in the contract. It's more akin to an estoppel. You can't claim the other party breached when you essentially blocked it from performing. Think about it. If the duty had to be stated in the contract for the prevention doctrine to apply, then you would never have the need for the prevention doctrine. The prevention doctrine supplies the necessary implied duty. And in this case, because they prevented us from performing, they couldn't then turn around and use that as a basis to terminate the contract. That in and of itself was a breach, and therefore on the prevention issue we should have won on summary judgment, not Cooke. Ms. Lewis, would you say it was foreseeable that the Cooke involvement was necessary prior to the signing of the original contract? You mean the VA? When you say the original contract? The requirements that the VA imposed, which required, in your view, Cooke to participate. Was that something that was in the contemplation or should have been in the contemplation of the parties before the original contract? Well, as I said before, all of this is not only in the FAR regulations and the Code of Federal Regulations. It's also in the VA's website. And all you had to do was look at the website and you would see that. Thank you. My time is up, Your Honor. Thank you. Ms. Calgar? Ms. Calgar? May it please the Court. I'm not sure I've ever sat and listened to an argument where so many things were presented as being undisputed that are disputed. However, what I'd like to start with is just kind of setting the table here a little bit about the parties' relationship. And I think the best words to use for that come right out of the complaint that was submitted by Akron at the beginning of this case back in 2015. Complaint paragraph 10 says, Together, the DOD and VA comprise the largest health care system in the United States. However, the processes of each agency are difficult for a vendor to navigate, absent familiarity with them. Akron offered that familiarity and the consequent opportunity to facilitate sale of Cooke's medical products to the DOD and the VA by educating Cooke on the government purchasing programs and serving as Cooke's distributor. So, in essence, even when the relationship had fallen apart in 2015 and there's a lawsuit here, Akron's still acknowledging that it's that company that came in with 30 years of government contracting experience and offered to help Cooke navigate this process. Akron had 30 years of this? They said they had 30 years of combined experience. They had no experience getting a federal supply schedule, which was, as far as I know, not disclosed until we got into this lawsuit, but it has been made clear. They weren't selling any products to the VA at that point in time that we know of. This is their first experience with the VA then? They claimed 30 years of government experience, and in this complaint they acknowledged that the reason we're here is because they held themselves out as experts in government contracting who could educate Cooke and help them through this process. And that's why we're here. That's why we entered this distribution agreement. And this is the key to this lawsuit, and this is what the district court looked at, and this is what the summary judgment review should focus on is this agreement. And it says nothing. It says absolutely nothing about Cooke submitting to an OIG commercial pricing audit. But you know what it does say. What it does say on page 9, or I'm sorry, on page 10, it says that, and this is Exhibit 15 at trial. It was also included in the summary judgment. But on page 10 of Exhibit 15, it says, for purposes of serving notices, requesting approvals, granting authorizations, or transmitting any correspondence related to this agreement, the addresses of Cooke and distributors shall be, except for Cooke. For Cooke, if we're submitting notices, requesting approvals, granting authorizations, or transmitting any correspondence related to this agreement, we're supposed to send a copy to general counsel. We're supposed to, according to Part B of Section 5 on page 10, all orders, notices, approvals, and authorizations shall be in writing and shall be personally served on an officer of the other party sent to the other party by a reputable overnight delivery service, et cetera, et cetera, et cetera. So we hear a lot about this undisputed that Cooke gave a letter of authorization to the VA about access to commercial sales. That could not be more disputed. We didn't have to spend a lot of time disputing it as a summary judgment stage, and the reason is because the court focused on the four corners of the document like the law requires. However, what we do know is that we have a letter signed by Ron Walters. We have two different versions of the letter, both dated June 14th, signed by Ron Walters. Who's Ron Walters? Ron Walters, as we can tell by looking at Exhibit 15, trial testimony, summary judgment, Ron Walters is a sales account executive at Cooke, not an officer. He doesn't have the authority to speak for Cooke, and with respect to why that's important is because that was important to the VA because at summary judgment there was a Deposition Exhibit 20 that was submitted, and that Deposition Exhibit 20 that was submitted at the summary judgment stage was from a contracting officer at the VA, and it was sent to Wes Pate, who was a representative of Akron. And that Exhibit 20 is a July 28, 2014 email in which Monet Robinson, the contracting specialist, says to Wes Pate again, as if expressing exasperation, the authorization letter indicates the government has access to sales records between Cooke and Akron Medical. Please rewrite the letter so that government access is granted to all commercial customer sales records. Be reminded to also have the letter signed by an authorized officer of the company. Now, why did I start by taking you to page 10 of the parties agreement? Because that says all requests for authorization and all of the notices and everything, that has to be sent in certain ways pursuant to this contract. So even though the letters dated June 10, Akron submitted Monet's letter to say, well, the letter that was signed by Ron that has just a broad generic blanket statement of any and all records that you need, that was signed after the contract. Well, if it was, then under the contract it should have been sent with a copy to general counsel, and according to Monet it should have been signed by a duly authorized officer of the company. There's a reason that didn't happen, Your Honors. And I don't have the luxury of splitting my time up and putting summary judgment over here and my counterclaim after the trial over here, and it's really hard to do that in this case anyway. And the reason it's hard to do that is because we basically tried the same thing twice. Even though summary judgment was granted in our favor on Akron's claim, Akron kept trying to show at trial that it wanted to introduce these authorization letters and all these other things in the defense of the counterclaim. And so at that trial, what the court found as a finder of fact is that Cook was truly shocked, that Ron Walters was shocked to have received this audit letter from the OIG's office, and it's because he'd been reassured it wasn't going to happen. And if the document that was sent to Ron for signature after Monet Robinson's emails at Exhibit 20 had said you have access to all commercial sales, Ron wouldn't have signed it because that was the premise here. We weren't applying for our own federal supply schedule. They were going to use their sales. They were going to use their experience. They were going to get their information. And the fact that it says we have a regulation out there that says that the reseller of a manufacturer's product is supposed to get permission to have access to commercial sales, well, according to paragraph 10 of Akron's complaint, they were going to educate us on things like that. That's why they were there. And so what they're trying to do in the absence of anything in this written integrated agreement is to come up with six, seven ways that they're so close to being able to convince a court that maybe, maybe you should apply the duty of good faith and fair dealing. But you know what, Your Honors, this court has said that doesn't provide an independent duty. It has to be a duty to do something that's in here. Or maybe you should find it's implied by the regulations. Well, as Judge Lawrence correctly found, the regulations put a duty on you, Akron, to obtain the authorization. And you know what you should have done? You should have sent Monet Robinson's request for this letter, and you should have sent it pursuant to your agreement, page 10A and B, and sent a copy off to Cook and its general counsel and let them determine as an entity whether they'd be willing to participate in that audit. And I think Your Honor mentioned that. Who's not reading this that you're concerned about? I'm sorry? You keep holding that up, and you've got to go to page 10. Who should have read page 10 that didn't, apparently? Akron should have. Akron should have read page 10. Because Wes Pate, who was getting letters from the VA and says, here, Ron, sign this letter. Don't, you know, Ron never even saw. He testified at trial. Ron never even saw the letter from Monet that asked for access to commercial sales. What Ron got was a letter that says, I'll give you anything I need to do to support the award. And Ron signed it, an account executive at Cook. Not a duly authorized officer. This is, you know, an award from the VA. I'm sorry? You said the award. Oh, I'm sorry, the e-mail, the verification. So in order, when Mr. Gasowitz was up here, he's telling you, well, we were supposed to, under the regulations, get access to the manufacturer's commercial sale records. And he says, we did that because Cook signed a letter of authorization. And my answer to that is, Ron Walters, an account executive, who isn't authorized to sign that letter, signed that letter. And Monet Robinson from the VA, who is asking for this letter of authorization, recognizes that it should be sent and signed by an officer. And the contract recognizes that if someone's asking for authorizations related to this contract, you should send it to general counsel. It wasn't, it wasn't, the trial testimony shows that it wasn't done correctly. It wasn't done right. Like so many things with respect to this deal. And I want to talk about this prevention doctrine idea. Here's what bothers me about that. Cook, in this contract, you'll see, Cook anticipated increased sales. Akron and Cook, through their discussions, had projected that they could increase sales 12% one year, 15% another year, 20% another year by getting these federal supply schedules and by working together. There's no benefit to Cook that this fell apart. That's why Ron was trying so hard. He was trying hard to get, you know, how can we get the federal supply schedule? He was trying hard to salvage the relationship at the end. We didn't want to terminate the agreement. He wanted to try to find a way to continue to work with Wes. And now those efforts are being thrown in Cook's face in the form of, you know, well, you elected your remedy. You didn't terminate the contract immediately. So nobody wins here. But the fact is that what we have is a startup company that essentially did nothing, that's seeking millions of dollars for doing nothing and blaming Cook Medical for not understanding that this audit would be required, that it's never negotiated into the contract, and that it was not clearly disclosed by the folks who are claiming to have 30 years of government experience and who in their own complaint say, well, we were there to educate you on this really difficult process. They obviously had no experience with Cook. I'm sorry? No experience with Cook. I'm sorry, the other way around. When you're talking about 30 years of experience. Right. It was 30 years of combined experience. I think in deposition we got, well, so-and-so had seven years and so-and-so had four years and this person. And it turned out it was contracting to, like, maintain floors in government buildings or something like that. But this is different. This is government procurement. This is what we needed was an expert who could advise us, STZ's regulations that now Cook or Akron wants to read into our agreement, even though the only thing that the regulation does is put a burden on Akron as the reseller to obtain access to information. And if they truly wanted to obtain access to the information, they should have followed their agreement and sent notices to the proper people to do that. I mean, this is just an unfortunate incident that took up a lot of time and money for both companies. And that turns me to my counterclaim. On our counterclaim, I mean, the trial court, not only did the trial court find on summary judgment that Cook didn't breach the contract, Akron did breach the contract, but it held a trial. And you'll see from the record that Akron tried everything it could to get as much of the summary judgment evidence back in front of the judge and try to get him to change his mind. But the court listened to the testimony and said, Akron's the one that breached the agreement, Akron breached a material term of the agreement, but I'm not going to give you your damages. The damages are getting the commission back, is that right? Yeah, $116,000. We could never be made whole. But it is the one amount that we know for sure that we extended to Akron, and we did so contingent upon them obtaining the federal supply schedule. That's what the word provided means in there. So both sides are here this afternoon or this morning. Neither one won, right, in the trial court. You could say that, Your Honor. And I see that I'm out of time, and I'm happy to answer your question. Well, answer the question, right? No, nobody won at the contract stage, nobody won in court. I mean, that is absolutely true. That is absolutely true. But what we're saying is we think that the court was correct in finding summary judgment. If this court sees that there was some error on any grounds in summary judgment, it should remand for further proceedings. I think Akron wants the court to grant summary judgment, and I don't think that's possible on this record. Thank you, Ms. Calgar. Your Honor, the majority of what Ms. Calgar was talking about was not in the record on summary judgment. This was what she's raising in her appellate brief, but it was not in the record on summary judgment, and that is not proper. She did it in her brief, and she's doing it now. All of these explanations or justifications why they didn't have to honor the letter of authorizations, that Mr. Walters was hoodwinked, that we didn't tell them or educate them enough, this was after the fact excuses for not cooperating. The argument that she's making about that we didn't give them proper notice, that Mr. Walters was not an officer, that their general counsel didn't get notice. I don't know why they would get notice, a general counsel would get notice of a letter or an e-mail from the VA officer, but these are ex post facto explanations, and I would just say this. With respect to all of that, Mr. Walters afterwards agreed. Notwithstanding that if he was hoodwinked, if he was hoodwinked and given a bill of goods, why was he telling the VA after the no award letter, yes, we will cooperate, and please speed it up so that we can do so. He never did that. I think we're a little bit over time. Yeah. I don't want to cut you off, but I need for you to wrap up. I would just say one thing in terms of the counterclaim. I would say it's the height of chutzpah for Cook to sue us when they prevented us from being able to get the VA. In other words, adding insult to injury, we want damages. Not only do we deprive you of your ability to do the contract. Thank you, Your Honor. All right. Thanks to both counsels. Case is taken under advisement.